## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

IN RE: JONATHAN WAYNE THOMPSON, Debtor      No. 5:17-bk-70175
     Chapter 13

BANK OF GRAVETT      PLAINTIFF

v.      5:17-ap-7026

JONATHAN WAYNE THOMPSON      DEFENDANT

### ORDER AND OPINION DENYING BANK OF GRAVETT'S COMPLAINT

On April 27, 2017, Bank of Gravett [the bank] filed the above-captioned adversary proceeding. In its adversary proceeding, the bank alleged that two debts owed by the debtor to the bank are nondischargeable under 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6). On May 26, 2017, the debtor filed his answer. The Court held a trial on August 15, 2017.[1] Paul L. Davidson appeared on behalf of the bank. Steven Travis Robbins appeared on behalf of the debtor. At the conclusion of the trial, the Court took the matter under advisement. For the reasons stated below, the Court finds that the bank failed to prove by a preponderance of the evidence that the debts in question are nondischargeable pursuant to § 523(a)(2), (a)(4), or (a)(6).

### Jurisdiction

The Court has jurisdiction over these matters under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and they are core proceedings under 28 U.S.C. § 157(b)(2)(I) and (L). This order

---

[1] At the parties' request, the Court also heard the bank's objection to confirmation of the debtor's plan on August 15, 2017. By separate order entered in the debtor's chapter 13 case, the Court overrules the bank's objection.

contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Background

From 2009 to early 2014, the debtor took out several loans with Bank of Gravett–some personal in nature and some agricultural.  All of the debtor's loans with the bank were handled by Kevin Rieff [Rieff], a vice-president and loan officer at the bank from 2006 to the end of October 2015.[2]  Until mid-2014, the debtor was employed full- time but had bought and sold approximately $15,000 worth of cattle each year since 2009.  On May 29, 2014–around the time that the debtor's outside employment terminated–the debtor borrowed $28,341.95 from the bank to purchase 22 head of cattle [2014 loan].  The debtor obtained the 2014 loan for the purpose of establishing a cattle business as his sole livelihood.  Although the 2014 loan was executed on commercial rather than agricultural loan documents, the parties agree that the 2014 loan was the first time that the debtor had obtained a loan for the singular purpose of buying cattle.[3]  As with all of the debtor's previous loans at the bank, Rieff served as the loan officer for the 2014 loan.  The 2014 loan required the debtor to make yearly payments of $6740.95, with the remaining balance to be paid when the loan matured on May 29, 2019.  The 2014 loan was secured by the cattle being purchased with the proceeds of the loan, collateral securing the debtor's other loans with the bank, and "all livestock now owned and hereinafter acquired."[4]  (Stip. Ex. 1)  The combined Note, Disclosure, and Security Agreement memorializing the terms of the 2014 loan provided that the debtor would "not sell, lease,

---

[2]  After Rieff left the bank in October 2015, Rhonda Jarvis [Jarvis] handled the debtor's loans until Katherine Johnson [Johnson] was assigned to them in October 2016.

[3]  The debtor testified that, prior to May 29, 2014, he had an outstanding cattle loan with the bank, but it was not "exclusively for the purpose of buying and selling cattle" or "being part of the cattle business."  Trial Tr., 91, Aug. 15, 2017.  No evidence was introduced regarding the terms of the debtor's prior loans with the bank.

[4]  The 2014 loan documents did not specify the number of cattle to be purchased with the loan proceeds but the debtor testified that he bought 22 head of cattle.

2

license, or otherwise transfer or encumber" the collateral securing the loan without the bank's prior written consent.  (Stip. Ex. 1)  The agreement also provided that the debtor would "upon receipt, deliver any proceeds or products" of the collateral to the bank. (Stip. Ex. 1)  As part of the security agreement, the debtor was required to provide to the bank a written list or schedule of "buyers, commission merchants and selling agents to or through whom Debtor may sell the Farm Products described in the Security Agreement [2014 schedule] . . . ."  (Stip. Ex. 2)  The 2014 schedule was signed by both the debtor and Rieff and provided that

> Debtor is aware that sale of the farm product collateral to or through anyone not on this list is illegal unless Debtor notifies the Secured Party in writing of the identity of the buyer, selling agent, or commission merchant at least 7 days prior to the sale or Debtor accounts to the Secured Party for the proceeds of the sale not later than 10 days after the sale.[5]

---

[5]  Presumably, this provision derives from the Federal Food Security Act of 1985, which states:

> (1) A security agreement in which a person engaged in farming operations creates a security interest in a farm product may require the person to furnish to the secured party a list of the buyers, commission merchants, and selling agents to or through whom the person engaged in farming operations may sell such farm product.

> (2) If a security agreement contains a provision described in paragraph (1) and such person engaged in farming operations sells the farm product collateral to a buyer or through a commission merchant or selling agent not included on such list, the person engaged in farming operations shall be subject to paragraph (3) unless the person–

>> (A) has notified the secured party in writing of the identity of the buyer, commission merchant, or selling agent at least 7 days prior to such sale; or

>> (B) has accounted to the secured party for the proceeds of such sale not late than 10 days after such sale.

> (3) A person violating paragraph (2) shall be fined $5000 or 15 per centum of the value or benefit received for such farm product described in the security agreement, whichever is greater.

3

(Stip. Ex. 2)  The 2014 schedule designated "Decatur Livestock" as the sole potential buyer of the debtor's cattle.  On May 29, 2014, the bank sent a Notice of Security Interest to Decatur Livestock Auction [Decatur Livestock], notifying Decatur Livestock that the Bank of Gravett held a security interest in "all livestock" of the debtor and instructing Decatur Livestock to make checks jointly payable to the debtor and the bank.  (Stip. Ex. 4)  The debtor did not sell any cattle through Decatur Livestock in 2014, but sold approximately 100 head of cattle to individual buyers that he had located primarily through various internet sites.  The debtor's 2014 federal income tax returns reflect income of $168,837 from "cattle sold."  (Def. Ex. 3)

In June 2014, the debtor and Wyatt Arnold [Arnold] formed TNA Farms, LLC [TNA Farms or the LLC].  The debtor and Arnold each owned 50% of TNA Farms.  Like the debtor, both Arnold and TNA Farms were in the business of buying and selling cattle. The debtor testified that although he sold cattle both individually[6] and on behalf of the LLC, the cattle were "completely separate . . . bought separate, sold separate . . . the ledgers are separate."  Trial Tr., 137.  The debtor and Arnold opened two bank accounts in the name of TNA Farms, LLC–one at the Bank of Gravett and one at Arvest Bank. The debtor testified that the accounts were  "personal and commercial at the same time." Trial Tr., 105.  Although the debtor characterized the accounts as "pretty much business accounts," he testified that his and Arnold's names were on the accounts "in individual capacities so that we could use them as [sic] an individual basis, as well."  Trial Tr., 105. According to the debtor, proceeds from the sale of his cattle–the cattle upon which Bank of Gravett had a lien–as well as proceeds from the sale of TNA Farms' cattle and proceeds from the sale of Arnold's cattle were deposited into the two TNA Farms' bank accounts.

---

7 U.S.C.A. § 1631(h).

[6]  The debtor's individual sales included those made under his d/b/a Thompson Farms.

4

On September 23, 2015, the debtor obtained a six-month loan from the bank in the amount of $72,116 [2015 loan]. The debtor combined the 2015 loan proceeds with $48,000 of his own money to purchase 60 black crossbred heifers for $120,000. As with the 2014 loan, Rieff was the loan officer assigned to the 2015 loan. To assist with the bank's evaluation of the debtor's loan application, the debtor gave Rieff his 2014 tax returns stating income of $168,837 from cattle sales. At trial, Rieff testified that he reviewed the debtor's tax returns before the bank extended the 2015 loan and acknowledged that the returns provided information about the extent of the debtor's cattle sales in 2014. However, Rieff did not recall asking the debtor if he had disclosed the buyers or received permission from the bank to sell cattle in 2014. Trial Tr., 40. If a loan exceeded certain parameters, the bank required Rieff to submit his recommendation to a committee for final approval or rejection of the loan. In recommending to the committee that the bank approve the debtor's 2015 loan, Rieff noted that

> Jonathan Thompson is requesting $72,000 to complete purchase of 60 bred heifers that will calve in Feb. and March of next year. Purchase price of the cattle is $2000/hd for total cost of $120,000. Mr. Thompson has paid $48,000 from personal funds. Requested loan terms are a 6-month single payment loan priced at 7.0%. Identified source of repayment is sale of the cattle. Mr. Thompson has contracted this group of cattle for $3000/hd after they have calved with delivery in mid March 2016.

(Def. Ex. 2) Rieff also specified that the loan would "be secured by lien on the cattle to be purchased. The group consists of 60 black heifer bred in the 2nd trimester with calving dates from the [sic] Feb 1st to March 1st. LTV will be 60% of purchase price with value supported by comparable sales at local markets." (Def. Ex. 2). Although Rieff stated in his recommendation that the debtor would repay the loan from the sale of the cattle, he also recognized that the debtor had "satisfactory bank history and has demonstrated ability to service loans with this payment structure. Credit history is good and repayment capacity is adequate without additional income from the sale of this group of cattle. [L]oan maturity has been structured to coincide with identified source of repayment." (Def. Ex. 2) The bank approved the 2015 loan, which was payable in full upon the bank's demand or, in the absence of a demand, upon the loan's maturity date of

5

March 23, 2016.

The Agricultural Security Agreement executed by the debtor and Rieff on September 23, 2015, provided, in relevant part:

> **GRANT OF SECURITY INTEREST.  For valuable consideration, Grantor grants to Lender a security interest in the Collateral, in addition to all other rights which Lender may have by law.**
>
> **COLLATERAL DESCRIPTION.  The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:**
>
> > **All Livestock (including all increase and supplies) - 60 black crossbred bred heifers**

(Stip. Ex. 6) The Collateral also encompassed

> any and all of the Grantor's future farm products, livestock . . . including other farm products of every type and description, including without limitation any and all offspring, unborn livestock, and other products, previously, contemporaneously, and/or in the future acquired by Grantor whether by purchase, exchange, accretion or otherwise, and all of Grantor's present and future inventory in any way derived or to be derived therefrom . . . and any and all additions thereto and substitutions and replacements therefor . . . and all other products and proceeds derived or to be derived therefrom . . . .

(Stip. Ex. 6)  The Agricultural Security Agreement additionally provided as follows:

> **Removal of the Collateral.**  Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.
>
> **Transactions Involving Collateral**.  Except for Inventory sold or accounts collected in the ordinary course of Grantor's business, or

6

as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement.  Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided, however, this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Sale of Collateral.**  The following provisions relate to any sale, consignment, lease, license, exchange, transfer, or other disposition of livestock included as all or part of the Collateral:

> (1)  To induce Lender to extend the credit or other financial accommodations secured by this Agreement, Grantor represents and warrants to Lender that Grantor will sell, consign, lease, license, exchange, or transfer the Collateral only to those persons whose names and addresses have been set forth on sales schedules delivered to Lender.  Each schedule shall be in such form as Lender may require, including identification of each type of Collateral.

> (2)  Grantor agrees to provide Lender a written list or schedule of the buyers, commission merchants, and selling agents to or through an individual including the entity name, contact name and address to whom the livestock may be sold, consigned or transferred.  All such schedules and notifications shall be in writing and shall be delivered to Lender not less than fourteen (14) days prior to any such sale, consignment or transfer of the livestock.  Also, the Grantor agrees to provide any updates or amendments to these schedules or lists to the Lender.

> (3)  All proceeds of any sale, consignment, lease, license, exchange, transfer, or other disposition shall be made immediately available to Lender in a form jointly payable to Grantor and Lender.  No provisions in this Agreement shall be interpreted to authorize any sale or disposition of

7

Collateral unless authorized by the Lender in writing. All chattel paper, contracts, warehouse receipts, documents, and other evidences of ownership or obligations relating to the Collateral, whether issued by a co-op, grain elevator, warehouse, marketing entity, or bailee, and all accounts and other proceeds of the Collateral shall be immediately endorsed, assigned and delivered by Grantor to Lender as security for the Indebtedness. At any time before or after the occurrence of an Event of Default, Lender may collect all proceeds of the Collateral without notice to Grantor. All proceeds of the Collateral, when received by Lender, may at Lender's sole discretion be applied to the Indebtedness. Grantor grants Lender a limited power of attorney to sign or endorse Grantor's name on all writings described in this section.

(4) Grantor acknowledges that if the livestock are sold, consigned, or transferred to any person not listed on a schedule delivered to Lender as provided above, at least seven (7) days prior to such sale, consignment or transfer within ten (10) days of the sale, consignment or transfer, then under federal law, Grantor shall be subject to a fine which is the greater of $5000 or 15% of the value of benefit received from the sale, consignment or transfer to an unlisted buyer, consignee or transferee.

(Stip. Ex. 6) As with the 2014 loan, the debtor was required to execute a schedule of buyers [2015 schedule]. The 2015 schedule was signed by both the debtor and Rieff but, unlike the 2014 schedule, the 2015 schedule did not designate Decatur Livestock as a potential buyer of the debtor's cattle. In fact, the 2015 schedule did not designate *any* potential buyers but instead featured a blank space after the statement that "[t]he following is a list of those buyers, selling agents, and commission merchants to whom Grantor may sell, consign, or transfer the Farm Products as designated[.]" (Stip. Ex. 7) At trial, Rieff admitted that it was atypical for the bank and a borrower to sign a schedule of buyers that gave a borrower in the business of selling cattle–the debtor–the ability to sell cattle to no one. Trial Tr., 41. Nonetheless, the bank sent Decatur Livestock a Notice to Buyer of Security Interest in Farm Products on September 23, 2015, advising Decatur Livestock that the bank held a security interest in the debtor's "cattle and calves"

8

and instructing that "[a]ll proceeds are to be paid jointly to Debtor and Secured Party." (Stip. Ex. 8)  The notice was signed only by Rieff.

After the debtor obtained the 2015 loan, he continued to sell cattle directly to cattle lots and corporate buyers, as well as to buyers that he had located through internet sites.  Trial Tr., 125.  He also continued to deposit funds from the sale of his cattle into the two LLC bank accounts, with most of the funds passing through the LLC account at the Bank of Gravett.  At trial, the bank's attorney asked Rieff, Jarvis, and Johnson if they knew that the debtor had sold cattle upon which the bank had a lien under the name of TNA Farms. All three witnesses replied that they were unaware of any such sales.  Trial Tr., 30, 65, 70.  The debtor acknowledged that he had, in fact, sold cattle under both his own name and that of TNA Farms, but explained that the cattle that he had sold under his own name were his and the cattle that he had sold under the name of TNA Farms were owned by TNA Farms.  Trial Tr., 137-38.  He testified unequivocally that he had sold "not a single cow" upon which the bank had a lien under the LLC's name.  Trial Tr., 104.

In addition to its efforts to show that the debtor had sold his own cattle under the LLC's name–which Rieff, Jarvis, and Johnson all agreed would have been a breach of the security agreements, had it happened–the bank directed much of its evidence toward establishing that the debtor had breached the security agreements in other ways, including: selling cattle to buyers other than Decatur Livestock–the entity designated as a potential buyer of the debtor's livestock on the 2014 schedule; failing to provide the bank with updated schedules or written lists identifying prospective buyers fourteen days prior to each sale; failing to ensure that buyers made checks jointly payable to the debtor and the bank; commingling sale proceeds from the sale of cattle upon which the bank had a lien with other funds by depositing the proceeds into the LLC bank accounts; and failing to remit proceeds of the cattle sales to the bank.

In response, the debtor testified that he believed that his sales, which were conducted in the ordinary course of his cattle business, fell outside the scope of the stringent

9

requirements listed most specifically under "Sale of Collateral" in the 2015 Agricultural Security Agreement. The debtor based this belief on the two preceding sections in the agreement entitled "Removal of Collateral" and "Transactions Involving Collateral," which the debtor interpreted to exclude sales conducted in the ordinary course of business from many of the requirements that followed.[7] Trial Tr., 126-27. The debtor's understanding of cattle sales in general reinforced his belief that the security agreements allowed him to sell cattle in the ordinary course of his business without disclosing the names of the buyers fourteen days in advance or receiving written permission from the bank. Specifically, the debtor testified that he could not have sold cattle in volume under the strictures that the bank contends governed *all* sales–including those made in the ordinary course of business–because most cattle sales are put together in less than a week–usually within 24 to 48 hours–due to market fluctuations dictating the best times to buy and sell cattle. Trial Tr., 102. Additionally, the debtor testified that he had an ongoing dialogue with Rieff such that Rieff was not only aware of how the debtor was operating his cattle business but, on multiple occasions, even met the debtor at sale barns.[8] Trial Tr., 95, 101, 127. Although Rieff, Jarvis, and Johnson testified that they did not waive any contractual obligations as to the debtor, Rieff acknowledged that, in some circumstances, the bank does waive the requirement that sale proceeds be remitted to the bank.[9] Trial Tr., 25. The debtor testified that he did not remit proceeds to the bank for application to his loans because, again, he believed that he was allowed to operate his business–the business of buying and selling cattle–under the agreements. He said that

---

[7] Rieff testified that he did not recall ever having a discussion with the debtor about how these potentially contradictory provisions fit together. Trial Tr., 36-7.

[8] Rieff testified that he did not feel like the debtor had attempted to deceive or mislead him during the six years in which Rieff was the debtor's loan officer at the bank. Trial Tr., 42.

[9] According to Rieff, the bank would consider waiving the requirement, usually for smaller loans, if a borrower was in good financial condition, had paid down the loan so that the loan was "in a really low collateral position," or had other collateral besides cattle securing the loan. Trial Tr., 25.

because he had to buy and sell cattle in order to stay in business, he used the proceeds of his cattle sales to buy more cattle, while any profits went toward operating expenses like veterinary care and food for the cattle.  Trial Tr., 95.

According to the debtor, "the cattle market took a fairly large dip" from November 2015 to March 2016.  Trial Tr., 106.  The debtor testified that due to the market downturn, he began selling cattle at a loss and realized that he would be unable to pay off the $50,000 balance of the 2015 loan when it matured on March 23, 2016.  As a result, the debtor contacted the bank prior to the 2015 loan's maturity date to request a six-month renewal of the loan.  When Rieff left the bank in late October 2015, the debtor's loans were assigned to loan officer Rhonda Jarvis.  According to Jarvis, a loan renewal required a 10% principal-reduction payment, a payment sufficient to bring the interest current on the loan, the payment of a renewal fee, and a satisfactory inspection of the collateral securing the original loan.

On March 7, 2016, the bank sent Rickie Stark [Stark] to inspect the debtor's cattle.  Stark noted in his inspection report that the debtor had 67 head of cattle comprised of 50 bred cows, 9 pairs, 3 bulls, and 5 replacement heifers.  Although Stark's report was devoid of any reference to the 60 black crossbred heifers securing the 2015 loan, Jarvis deemed the inspection results sufficient for the renewal because the bank was "still adequately collateralized."  Trial Tr., 61.[10]  On March 8, 2016, the debtor gave Jarvis permission to debit $24,482.76 from the TNA Farms account at Bank of Gravett–an amount well over the 10% principal-reduction and interest payment required for the renewal–and the bank renewed the 2015 loan for six months, extending the loan's maturity date to September 8, 2016.  On March 8, 2016, the debtor signed a promissory note for the renewal but did not

---

[10]   The fact that none of the 60 black crossbred heifers were noted on Stark's March 7, 2016 inspection report is compatible with what the debtor told the bank when he applied for the 2015 loan–namely, that he had entered into a contract to sell the 60 black crossbred heifers in March 2016.  (*See* Def. Ex. 2)

enter into a new security agreement.[11]

The debtor testified that in early August 2016, he realized that he would not be able to pay the $50,000 balance of the 2015 loan when it became due on September 8, 2016. At least thirty days before the 2015 loan matured, the debtor met with Jarvis about extending the maturity date for an additional six to twelve months or obtaining a new line of credit until the cattle market improved–which the debtor expected, at that point, to happen within six to twelve months based upon the fact that the market had by then been on a downward trend for eight months. He testified that "one good month" would have allowed him to get back on track because he sometimes made $30,000 in a single month. Trial Tr., 110. The debtor testified that his cattle inventory had dwindled to the point that he could not offer the bank cattle as collateral for the extension or line of credit and "needed to offer them something else." Trial Tr., 109. The debtor said that he offered the bank approximately $20,000 worth of tractors and farm equipment as security for the extension or line of credit that he sought from the bank in August 2016. Based upon his discussions with the bank about the type of collateral that he could pledge for an extension or line of credit, the debtor testified that the bank was "fully aware" by August 2016 that he had few cattle left. Trial Tr., 109. Jarvis testified that the bank denied the debtor's application for a new loan or line of credit because the debtor had "excess debt against what his income was." Trial Tr., 56. The debtor had not anticipated the bank's denial of his request for more time to pay the 2015 loan or a line of credit, testifying that

> I mean, we had been working with them for – since 2009, you know. The relationship had grown so well that, you know, it really didn't become an if we would ever get a loan; it was, hey, when we needed it, it was there, you know. And we worked, you know, very diligently with Rieff. You know, we made sure that whenever we had loans, we paid them off early. If something came up, we were in notification with him. You know, there

---

[11] Jarvis testified that the bank erroneously referenced a March 8, 2016 security agreement in the March 8, 2016 promissory note. (Stip. Ex. 11) However, the parties did not execute a new security agreement for the March 8, 2016 renewal. Rather, the September 23, 2015 Agricultural Security Agreement related to both the original 2015 loan and the renewal on March 8, 2016.

> was never any phone calls between us and him that said, "Hey, what's
> going on?" or anything like that. You know, that was always done. And
> even whenever we were going into the renewal of what ended up being the
> – you know, the default on that loan, you know, we went to them a month
> in advance, you know, to try to, you know, cut that process out and make
> sure that, hey, we're going to get this thing paid, we'll get further out, you
> know, and we'll just keep going with the relationship.

Trial Tr., 110.

The debtor did not pay the balance of the 2015 loan when it matured on September 8, 2016. Jarvis testified that ten days after the loan matured, she tried to contact the debtor but was initially unsuccessful. Trial Tr., 57. Subsequently, the bank determined that there was a potential problem with the payment of the debtor's 2015 loan and assigned loan officer Katherine Johnson to the debtor's loans. On three occasions–October 11, 2016, October 13, 2016, and November 3, 2016–Johnson and Jarvis went to the debtor's property and attempted to inspect his cattle. On the three occasions, they saw no cattle on the debtor's property; on the first two visits, the debtor was not present. On their November 3 visit to the debtor's property, Jarvis and Johnson spoke with the debtor and inquired about the location of the cattle. Jarvis testified that the debtor told her and Johnson that the cattle were in feed lots and that "they were to be sold and he was waiting on them to be sold." Trial Tr., 58. Johnson testified similarly, recalling that the debtor informed them that "the cattle were at a lot." Trial Tr., 72. Johnson also recalled that the debtor told her and Jarvis "that they were waiting for a contract to fill to get paid, that when they got that contract paid that he would have to pay Decatur Livestock Auction, because he had to fill some of their cows to meet the contract, and that the rest of the money would come to Bank of Gravett." Trial Tr., 73. Johnson testified that she asked the debtor where the feed lots were located and that the debtor "said he'd have to check his records and he'd get that to us. And we did not get that." Trial Tr., 73.

At trial, the debtor confirmed that he told Jarvis and Johnson on November 3 that the cattle were on feed lots, but reiterated that he had already told the bank in August 2016

13

that he had sold most of the cattle and, as a result, could not offer cattle as collateral for the line of credit that he was seeking at that time. He maintained, however, that his statements to the bank in August and on November 3 were both true and were consistent with one another due to the way a contract to sell cattle to a lot is structured.[12] The debtor explained that he had entered into a contract to sell cattle in March or April 2016 [Spring 2016 contract], but that the cattle remained on his property until late August or early September, at which time they were transferred to feed lots. The debtor testified that when cattle are sold to a lot, "they're sold on a 180 day to 270 day contract." Trial Tr., 96. He explained that a buyer pays for and becomes the owner of the cattle when the contract is executed–in this instance, March or April 2016–but that the seller retains an interest in the cattle until the contract is fulfilled at the end of the 180 to 270 day period due to a "sliding scale" provision in the contract. Trial Tr., 96. Specifically, the debtor explained the process as follows:

> So it pretty much means that a contract is written up. The buyer wants a certain amount of cows at a specific price, and he'll by then [sic], we'll say, in March. And you know, we – he'd say, "I want 30 head," you know, he'll buy them in March, he'll pay for them there. And whenever they ship to lots, you know, the contract will say between this 180 days or 270 days, you know, there'll be a sliding scale, usually about 10 to 15 cents. And, you know, that protection is for both the seller and the buyer. It pretty much says, you know, between March and when those contracts actually fulfill, if the market improves, then, you know, me, as the seller, I get a sliding scale of 15 cents more if those cows go up in price. And you know, if they go up 30 cents, I still only get 15. You know, if they go up 8, I get 8. And vice versa, you know, the same thing goes on the reverse side. If the cattle go down, then, obviously, you know, I make that payment out to them on the exact same amount. But, you know, once they're shipped to the lots, we do carry an interest in them. You know, obviously, you know, we want to see those prices go up so we get that extra money, but the cattle themselves are already, you know, in the possession of, you know, the lot. They own them. We just have a, you know, vested interest in them.

Trial Tr., 96-7. Operating under this contractual framework, the debtor testified that he had set aside $3000 in anticipation of owing the cattle lot money when he fulfilled the

_____

[12]  The debtor did not specifically identify the buyer under the Spring 2016 contract, but based upon the debtor's testimony about the contract, it appears to have been a cattle lot.

Spring 2016 contract because of the depressed market.  Trial Tr., 113-14.

The debtor said that at the end of the November 3 discussion, he told Jarvis and Johnson that he would pay the bank what he owed but could not pay it all immediately and needed to work something out with the bank.  He testified that he believed that Jarvis and Johnson were going to go back to the bank and "see what deal they could do."  Trial Tr., 112.  Because he heard nothing further from the bank after November 3, the debtor telephoned Johnson at the end of November, at which time Johnson offered to let him pay interest on the loan immediately and the remaining balance of the loan in 30 days.  The debtor said that he could not come up with  $50,000 within 30 days.  The bank offered no further accommodation.

At the time the debtor fulfilled the Spring 2016 sale contract with the cattle lot, the market suddenly improved enough to release the debtor from his anticipated contractual obligation to pay the lot $3000 pursuant to the sliding scale.[13]  Trial Tr., 113-14.  As a result, the debtor took the $3000 that he had previously ear-marked for paying the cattle lot and paid off a 2013 loan with the bank that was secured by 15 head of cattle and some farm equipment.  Trial Tr., 113-14.  Near the end of 2016, the bank sued the debtor in state court.[14]  On January 12, 2017, a deputy sheriff served the debtor with an Order of Delivery that authorized the sheriff to take possession of the collateral for the 2015 loan, specifically, "All livestock (including increases and supplies)–60 black crossbred bred heifers.  All livestock now owned and hereafter acquired."  (Stip. Ex. 17).  At that time, the debtor told the deputy sheriff that he had sold the last of the cattle in August.  On January 26, 2017, the debtor filed his chapter 13 bankruptcy petition.  On April 27, 2017, the bank filed the instant adversary proceeding.

---

[13]  The Court has no direct evidence establishing the date that the debtor fulfilled the Spring 2016 contract, but it appears to have been sometime after November 3, 2016.

[14]  The state court complaint was not introduced at trial.

**Findings of Fact and Conclusions of Law**

In its adversary proceeding, the bank seeks a determination that the debts resulting from the 2014 and 2015 loans are excepted from discharge pursuant to § 523(a)(2)(A), (a)(4), and (a)(6). However, because § 523(a)(6) is not applicable in chapter 13 cases, the Court finds that the bank is not entitled to relief under subsection (a)(6) and denies that portion of the bank's complaint. *See* 11 U.S.C. § 1328(a)(2); *see also Handeen v. LeMaire* (*In re LeMaire*), 898 F.2d 1346, 1348 (8th Cir. 1990). Courts must construe exceptions to discharge "strictly and narrowly against the creditor and liberally in favor of the debtor to facilitate the debtor's fresh start." *Hernandez v. Sullier* (*In re Sullier*), 541 B.R. 867, 877 (Bankr. D. Minn. 2015) (citing *Reshetar Sys. Inc. v. Thompson* (*In re Thompson*), 686 F.3d 940, 944 (8th Cir. 2012)); *see also Arvest Mortgage Co. v. Nail* (*In re Nail*), 680 F.3d 1036, 1038 (8th Cir. 2012) (citing *Belfry v. Cardozo* (*In re Belfry*), 862 F.2d 661, 662 (8th Cir. 1988)). Therefore, the debts in question will not be excepted from discharge unless the bank proves each element of § 523(a)(2)(A) or (a)(4) by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991).

**Section 523(a)(2)(A)**

Section 523(a)(2)(A) provides, in relevant part, that a discharge under § 1328(b) does not discharge an individual debtor from any debt

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.][15]

---

[15] In this case, the bank alleges that it is entitled to relief under § 523(a)(2)(A) because the debtor made false representations, specifically stating in its complaint:

> That the representations made by the defendant to the plaintiff with respect to his ownership, possession, status, and encumbrance of the collateral were false; the defendant knew the representations to be false at the time they were made; the defendant intended to deceive the plaintiff or to induce the plaintiff to act upon the representations; the plaintiff justifiably relied on such representations in not exercising its remedies,

16

11 U.S.C. § 523(a)(2)(A).  To prove its case under § 523(a)(2)A) based upon a false representation, the bank must prove that the debtor:  (1) made a representation; (2) with the knowledge of its falsity; (3) deliberately for the purpose of deceiving the bank; (4) who justifiably relied on the representation; and which (5) proximately caused damage to the bank.  *See Hernandez v. Gen. Mills Fed. Credit Union* (*In re Hernandez*), 860 F.3d 591, 602 (8th Cir. 2017) (citation omitted).

Regarding the first element, the Court finds that the bank proved that the debtor made the following representations:

(1)     on May 29, 2014, and September 23, 2015, the debtor signed promissory notes, security agreements, and schedules of buyers, representing to the bank that he would abide by the terms contained within those documents;

(2)     on March 7, 2016–the day before the bank approved the renewal of the 2015 loan–the debtor represented to Stark, the bank's cattle inspector, that he was the sole owner of the cattle and that there were no encumbrances or liens on the cattle except for the bank's;

(3)     on March 8, 2016, the debtor signed a promissory note in connection with the bank's renewal of the 2015 loan, representing that he would repay the loan by September 8, 2016;

(4)     on November 3, 2016–approximately six weeks after the debtor defaulted on the 2015 loan–the debtor represented to Jarvis and Johnson that the cattle were on a feed lot waiting to be sold;

(5)     on January 12, 2017–after the bank had sued the debtor in state court–the debtor represented to a deputy sheriff that he had sold the last of the cattle in August.

However, not every representation–even if false–is germane to a dischargeability analysis under § 523(a)(2)(A).  *Marcusen v. Glen* (*In re Glen*), 427 B.R. 488, 494 (B.A.P. 8th Cir.

---

including the foreclosing of its liens, possession and the sale of the collateral to mitigate its damages, resulting in substantial loss to the plaintiff.

(Compl. ¶ 26.)

2010). Rather, in order for a representation to be relevant in the context of subsection (a)(2)(A), the debtor must have made the representation during a certain time frame–specifically, either prior to or contemporaneously with the debtor obtaining the money, property, services, or extension, renewal, or refinancing of credit that resulted in the debt at issue. *See id.* at 492, 494. Here, the debtor obtained loans on May 29, 2014, and September 23, 2015, and obtained the renewal of the 2015 loan on March 8, 2016. No new loans or renewals were obtained by the debtor on November 3, 2016, or January 12, 2017.

Because the debtor obtained no new loans or renewals on November 3, 2016, or January 12, 2017–and because common sense dictates that the debtor could not have "obtained" the May 29, 2014 loan, the September 23, 2015 loan, or the March 8, 2016 renewal as a result of representations that he made to the bank months *later* on November 3, 2016, and January 12, 2017–the Court finds that the debtor's November 3, 2016 and January 12, 2017 representations are not relevant to its analysis under subsection (a)(2)(A). Therefore, the Court will not consider those two representations further in relation to this subsection. The Court does find, however, that the debtor's representations on May 29, 2014, September 23, 2015, March 7, 2016, and March 8, 2016, fall within the relevant time frame and therefore satisfy the first element required for a finding of nondischargeability under subsection (a)(2)(A).

To meet the second element under (a)(2)(A), the Court must find that the debtor made a representation with the knowledge that it was false. The Court will examine the debtor's representations on May 29, 2014, September 23, 2015, March 7, 2016, and March 8, 2016, in turn below.

On May 29, 2014, the debtor obtained the 2014 loan. On that date, he signed a Note, Disclosure, and Security Agreement that required him to obtain written permission from the bank prior to selling collateral for the loan and also required the debtor to deliver any "proceeds and products" of the collateral to the bank upon receipt. The 2014 security

18

agreement contained no exception for sales conducted in the ordinary course of business. Also on May 29, 2014, the debtor executed the 2014 schedule designating Decatur Livestock as the only potential buyer of the debtor's cattle. At trial, the debtor did not dispute that he failed to seek the bank's permission prior to selling cattle upon which the bank had a lien. Similarly, the debtor acknowledged that he used sale proceeds to buy more cattle instead of delivering the proceeds to the bank. However, the relevant inquiry for the "knowledge of falsity" element in this instance is not whether the debtor subsequently breached the agreement but whether the debtor knew that he was going to do so when he signed the documents. The Court finds that the bank did not carry its burden of proving that the debtor knew that his May 29, 2014 representations were false at the time that he made them.

As of May 29, 2014, the debtor had bought and sold cattle on a small scale but had not yet attempted to sell cattle in volume as his sole source of income. Additionally, although the debtor had taken out one loan from the bank prior to May 29, 2014, that he used, in part, to buy cattle, the Court has no evidence regarding the terms of that prior agreement–specifically, whether it required the debtor to seek the bank's permission prior to selling cattle or dictated what the debtor could do with sale proceeds. Further, the Court has no evidence regarding the methods that the debtor employed to buy and sell cattle prior to making cattle sales his full-time occupation. There is no question, however, that the debtor began selling cattle in volume only *after* he obtained the 2014 loan on May 29, 2014. Due to the debtor's inexperience in high-volume cattle sales prior to May 29, 2014, the Court finds it unlikely that on May 29, the debtor (1) recognized that operating under the terms of the 2014 loan documents could hinder the success of his new cattle business and, as a result, (2) had already concluded that he would simply ignore any potentially unfavorable terms. Because there is no evidence in the record to suggest that the debtor knew that he was making a representation that was false on May 29, 2014, the Court will not further consider this particular representation in its analysis of the remaining elements required under subsection (a)(2)(A).

19

On September 23, 2015, the debtor obtained the 2015 loan.  On that date, he signed a promissory note, the Agricultural Security Agreement, and the 2015 schedule.  In contrast to the 2014 loan, which was consummated on commercial loan documents, the parties executed the 2015 loan on documents tailored specifically to agriculture loans.  As a result, the Agricultural Security Agreement executed with the 2015 loan contained significantly expanded provisions governing the debtor's sale of livestock and the parameters within which the debtor was allowed to handle and use sale proceeds.  Also on September 23, 2015, the debtor executed the 2015 schedule.  This time, the debtor made no representation that he would sell cattle to Decatur Livestock, but instead signed a blank schedule.  As with the 2014 loan, whether the debtor breached at least some of the terms of the Agricultural Security Agreement is not in serious controversy at this point.  The Court finds that the debtor did not strictly adhere to his contractual duties to supply the bank with names of buyers and updated schedules of buyers prior to sales, obtain the bank's written permission prior to sales, remit sale proceeds to the bank, and segregate sale proceeds separate from other monies.  However, the Court finds that the debtor did not know when he signed the agreement on September 23, 2015, that he would operate his business in violation of its terms.

By September 23, 2015, the debtor was a more seasoned participant in the cattle business than he had been when he executed the 2014 loan documents–making over $168,000 in 2014 from cattle sales to various buyers that, notably, did not include Decatur Livestock. Based upon his prior success using the internet to sell cattle, the Court finds it more likely than not that the debtor knew on September 23, 2015, that he would continue to sell cattle on short notice to internet-based buyers without obtaining the bank's prior permission, without supplying the names of the buyers to the bank before the sales, and without delivering the proceeds of the sales to the bank for application to his loan balances.  However, the Court also finds that the debtor believed that these practices–which were by then in the ordinary course of his business–were allowed under the Agricultural Security Agreement, which–unlike the 2014 security agreement–contained at least a colorable exception for sales conducted in the ordinary

20

course of business.  Additionally, prior to the bank's approval of the 2015 loan, the debtor had provided his 2014 tax returns to Rieff–returns that clearly indicated that the debtor had sold a substantial number of cattle in 2014.  Yet, the bank asked the debtor no questions about his lack of compliance with the 2014 security agreement or 2014 schedule before approving the 2015 loan.  The debtor had transacted sales through the internet for over a year when he signed the 2015 agreement and had no reason to think on September 23, 2015, that the bank was opposed to the way that he was conducting his business.  Further, the fact that Rieff signed off on the debtor's blank buyers' schedule on September 23, 2015, could conceivably have been interpreted by the debtor as another indication that the bank consented to–or at least did not object to–the debtor's then-established practice of selling cattle to buyers not disclosed to the bank in advance.  For all of these reasons, the Court finds that the debtor did not make representations that were knowingly false on September 23, 2015, and will therefore not consider the debtor's September 23, 2015 representation as to the other elements under (a)(2)(A).[16]

On March 7, 2016, the debtor represented to Stark, the bank's cattle inspector, that he was the sole owner of the 67 cattle noted on Stark's inspection report and that there were no encumbrances or liens on the cattle except for the bank's.  Although the debtor later sold the cattle–at least in part pursuant to the Spring 2016 contract that the debtor entered into in late March or early April 2016–there is no evidence that on March 7, 2016, the

---

[16]  Had the Court reached the remaining elements under (a)(2)(A) in regard to the debtor's September 23 representations, the bank's failure to even casually question the debtor about his prior cattle sales after receiving the debtor's 2014 tax returns reflecting sales of $168,837 would have weighed in favor of a finding that the bank did not justifiably rely on the debtor's September 23, 2015 representations.  *See Field v. Mans*, 516 U.S. 59, 71 (1995) (a creditor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him had he utilized his opportunity to make a cursory examination or investigation.")  In the same vein, had it been necessary for the Court to determine whether the debtor intended to deceive the bank for purposes of subsection (a)(2)(A), it would have been relevant to the Court's analysis that Rieff–the debtor's loan officer from 2009 to 2015–testified that at no point in that six-year time span did he believe that the debtor had tried to deceive him.

21

debtor's representation to Stark was false.  As a result, the Court has no basis for finding that it was knowingly false and will not further consider the debtor's March 7 representation in relation to subsection (a)(2)(A).

On March 8, 2016, the bank approved the renewal of the 2015 loan.  On that date, the debtor signed a new promissory note, but did not sign a new security agreement–despite the bank's erroneous reference to a March 8, 2016 security agreement in the promissory note.  Therefore, the only representation that the debtor made on March 8, 2016, was that he would repay the 2015 loan on its new maturity date of September 8, 2016.  The Court finds that there is no evidence that the debtor knew on March 8, 2016, that the cattle market would remain depressed and that he would be unable to pay the bank the $50,000 balance of the 2015 loan on September 8, 2016–particularly when the debtor sometimes made more than half of that amount in a single month.[17]  For these reasons, the Court finds that the debtor did not make a knowingly false representation on March 8, 2016.  With no further representations to consider, the Court finds that the bank did not prove the elements required for a finding of nondischargeability under § 523(a)(2)(A) and, therefore, denies the portion of the bank's complaint brought under that subsection.

## Section 523(a)(4)

Section 523(a)(4) provides that a discharge under § 1328(b) "does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  Here, the bank alleges that the debtor is not entitled to discharge his debts to the bank under (a)(4) because he committed "fraud or defalcation while acting in a fiduciary capacity."  (Compl. ¶ 11.)  To succeed in proving its (a)(4) allegations, the bank must prove that while the debtor was acting within a fiduciary capacity, he committed fraud or defalcation.  *See Floorplan*

---

[17]  Although the Court recognizes that the debtor realized at some point prior to his fulfillment of the Spring 2016 contract that the market was still depressed enough that he would probably owe the cattle lot $3000, the Court has no evidence regarding when the debtor came to that realization or when he set aside the $3000 to pay the lot.

*Xpress, LLC-OK v. Bagsby* (*In re Bagsby*), Adv. No. 16-04124-can, 2017 WL 3084405, *3 (Bankr. W.D. Mo. July 18, 2017).  "'Whether a relationship is a 'fiduciary' one within the meaning of § 523(a)(4) is a question of federal law.'"  *In re Nail*, 680 F.3d at 1039 (quoting *Tudor Oaks Ltd. P'ship v. Cochrane* (*In re Cochrane*), 124 F.3d 978, 984 (8th Cir. 1997)).  "Section 523(a)(4) uses the term fiduciary 'in a "strict and narrow sense," and therefore does not embrace trustees of constructive trusts imposed by law because of the trustee's malfeasance.'"  *In re Thompson*, 686 F.3d at 944 (quoting *Hunter v. Philpott*, 373 F.3d 873, 876 (8th Cir. 2004)).  "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio.  He must have been a trustee before the wrongdoing and without reference thereto."  *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934) (citation omitted).  "Trusts satisfying § 523(a)(4) can be created by state statute or common law, as well as by contract."  *In re Thompson*, 686 F.3d at 944 (citation omitted).

In the instant case, the bank has not directed the Court to a state statute, common law tenet, or specific contractual provision that it believes created a trust of which the debtor became trustee–and the Court finds none.  However, to the extent the bank relies on the provision in the Agricultural Security Agreement that states "[u]nless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender . . . ." the Court finds that the provision did not create the type of trust falling within the scope of subsection (a)(4).  Although the document references the word "trust," "'[i]t is the substance of a transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy purposes.'"  *In re Nail*, 680 F.3d at 1040 (citing *Barclays Am./Bus. Credit, Inc v. Long* (*In re Long*), 774 F.2d 875, 878-79 (8th Cir. 1985)).  In addition, "[m]ost secured lending agreements impose duties on the borrower in dealing with the creditor's collateral, but those duties seldom create a § 523(a)(4) fiduciary capacity."  *In re Nail*, 680 F.3d at 1040.  In *In re Nail*, the Eighth Circuit stated:

In *In re Long*, 774 F.2d at 878-79, we cited *Davis* in affirming a decision

23

> that § 523(a)(4) did not render a secured debt nondischargeable; we concluded that the contract between a secured inventory lender and the bankrupt merchant in which the borrower agreed to become trustee of an "express trust" was nonetheless "intrinsically more contractual than fiduciary."

*Id.*  Based upon the Eighth Circuit's historical reluctance to construe a contract between a secured lender and a debtor as a trust for purposes of (a)(4), regardless of the language used by the parties–and absent any direction from the bank regarding the basis for its allegation that the debtor committed fraud or defalcation *while acting in a fiduciary capacity*–the Court finds that the debtor's duties to the bank were contractual rather than fiduciary in nature.  Therefore, the Court finds that the bank failed to carry its burden of proof under subsection (a)(4) and denies the bank's complaint as to § 523(a)(4).

## Conclusion

For all of the above stated reasons, the Court finds that Bank of Gravett failed to prove by a preponderance of the evidence that the debts owed to the bank are nondischargeable. As a result, the Court denies Bank of Gravett's complaint in its entirety.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:   10/11/2017

cc:     Paul L. Davidson, attorney for Bank of Gravett
        Steven Travis Robbins, attorney for debtor
        Jonathan Wayne Thompson, debtor
        Joyce Bradley Babin, chapter 13 trustee

24